## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| **VJ, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:14-cv-02919-SHM-dkv** |
| | ) | **JURY DEMANDED** |
| **STATE AUTO PROPERTY AND** | ) | |
| **CASUALTY INSURANCE CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OF LAW IN SUPUPORT OF MOTION TO EXCLUDE PLAINTIFF'S PROFFERED EXPERT HOWARTH

Defendant, State Auto Property and Casualty Insurance Co. ("State Auto"), by and through undersigned counsel, and pursuant to the Federal Rules of Evidence and this Court's previous Case Management Orders, moves this Honorable Court for an Order Excluding the Testimony of Plaintiff's Proffered Expert, Charles Howarth, and would show as follows:

### FACTS AND PROCEDURAL HISTORY

The present litigation arises out of a theft loss that occurred on or about May 31, 2013. (Doc. 1). A claim was made for that damage under a policy of insurance issued by State Auto to VJ, LLC. Id. Stephanie Simmons ("Simmons") was the Senior Claims Adjuster assigned to the claim, and Darrell Howard ("Howard") was the Claims Examiner. (Exhibit 1, p. 8). Howard retained attorney Michael "Mick" Mills ("Mills") to provide State Auto with a coverage opinion on the plaintiff's claim. (Exhibit 2, p. 32-33). Howard "wanted somebody with expertise in Tennessee law" and "wanted to make sure how the Tennessee courts interpreted the policy." Id. at 17. Mills knew he was asked

to render an opinion so that State Auto could apply it to the plaintiff's claim.  (Exhibit 8,

p. 107).  Howard testified:

> Q    Okay.  Focusing on the VJ property, would you agree that if jobs
> were being performed during the 60 days prior to the loss and
> during those jobs, the people that were working utilized the
> bathrooms, that the bathrooms square footage should also be
> included when you're talking about what percentage of the property
> was being used to conduct customary operations?
> A    That's really a question we depended on Mick Mills for, his
> interpretation, Tennessee interpretation of occupancy.

(Exhibit 2, p. 37).  Howard relied on Mills to tell him what he needed to look for from a

coverage perspective.  Id. at 69.  Early in the claim process, State Auto learned that

Southern Bindery, the business that had leased the insured premises, had been closed

in December of 2012.  (Exhibit 3, p. 3).   State Auto also learned there were book

binding operations performed by another person/entity on the premises in the month

prior to the reported date of loss.  Id. at 6.  Wallace Jaco ("Jaco") explained that a

former employee had an emergency that required the use of the printing equipment that

month.  However, Jaco failed to specifically identify that employee to State Auto.  Id.

In a letter dated June 28, 2013, Mills determined State Auto would lose an

argument that the building was not rented the month before the loss, and advised

Howard:

> In summary, we need to determine what square footage of the building
> was used to do the jobs the insured referenced occurred between
> December 2012 and May 2013, as well as when those jobs occurred.  The
> answer to those questions is going to determine whether the vacancy
> provisions apply.

(Exhibit 4).  On July 15, 2013, Howard forwarded the letter to Simmons and instructed

her to follow up to see "what jobs were completed between 12/12 and 5/13, when these

jobs were completed and what square footage of the building was required to complete

these jobs." (Exhibit 1, p. 55-56).  Within days after receiving that instruction, Simmons followed up with Jaco, who roughly "guestimated" 20,000 square feet was used to complete the jobs. (Exhibit 1, p. 56, 59-60).  Later, Simmons followed up with Jaco and asked him:

> What jobs were completed in your buildings between December 2012 and May 2013?  Please list each job, details of the job, and length of the job.  If you have written contracts, please send them.
> What square footage of the building was required to complete these jobs?

(Exhibit 1, p. 124).  Simmons had also instructed State Auto's independent adjuster to "measure the area where the alleged work took place."  (Exhibit 5, p. 192-193).  Mills never instructed anyone at State Auto as to whether they should include things like hallways, bathrooms, break rooms, or mechanical closets.  (Exhibit 1, p. 111).

On October 24, 2013, Jaco advised Simmons that he guestimated the square footage required to complete the job in May 2013 was 15,000 square feet, but explained this was a rough guestimate.  (Exhibit 1, p. 95-96).   Then, on November 6, 2013, Jaco left Simmons a voicemail wherein he advised:

> This is Wallace Jaco.  VJ, LLC.  I was going to give you the information on these books.  In the first part of April we did 3,000 books.  260 pages plus cover.  The books were for A-1 Printing company who printed them for World Overcomers.  In May about a fourth of the way into the third, close to the fourth, week there were two books.  They were Volume I: 340 pages.  Volume 2: 360 pages.  There were 2,500 each of these books.  They were for A-1 Printing, and he was doing them for Church of God in Christ's women's annual convention.  If you have any more questions – oh, by the way, I told you, I think I told you 15,000 square feet.  Actually, it was probably only about 8,000 square foot that these books took up.  I was confused in my mind as to what it was, but that's about all the space it took up to do the books.  If you have any more questions, give me a call.  You have my number.  Thank you.

(Exhibit 6, p. 147-148).  When asked why he changed the figure from 15,000 to 8,000, he explained:

> Because the first figure I gave from home and I was guessing.  I actually went to the shop and looked as to how much room it would take up around the binder.  To put one book around the binder and complete it.  Again, I did not take into consideration that we had to go get boxes and we had to do this and we had to do that.

Id. at 149.   After receiving Jaco's voicemail, Simmons forwarded the information provided in the voicemail to both Mills and Howard.  (Exhibit 1, p. 111).  Mills then emailed Simmons and Howard on December 23, 2013 to ask if they had anything that showed how big the insured structure was, and opined that "[i]deally, we would have someone take measurements for us."  (Exhibit 1, p. 112-113, 121).  In response, on December 30, 2013, Simmons emailed Mills advising him:

> I have attached the tax records to document the total square footage of the buildings.
>
> **Let me know if you require any additional information.**

(Exhibit 7 (emphasis added)).   Mills, however, never advised Simmons that he needed any additional information to complete his coverage opinion.  (Exhibit 1, p. 122).  Once he received the tax records, Mills did not think it was necessary to do anything else to determine the square footage of the buildings themselves.  (Exhibit 8, p. 110).   The next thing Simmons received from Mills was his coverage opinion letter on January 9, 2014.  (Exhibit 1, p. 122-123).   In that letter, Mills explained that "[f]rom the recent information forwarded regarding the use by the insured of approximately 8,000 square feet of the insured property for a job shortly before the alleged loss, it appears to me that the vacancy clause of the policy applies," and recommended "that this claim be denied."  (Exhibit 9).  Based upon the legal representations made by coverage counsel Mills in his letters dated June 28, 2013 and January 9, 2014, State Auto denied the plaintiff's claim for insurance proceeds on February 12, 2014.  (Exhibit 10, Affidavit of

Marc Lovrak, ¶ 3, and Exhibit 11).  The provision relied upon in the denial provided as follows:

**9.     Vacancy**

      **a.     Description Of Terms**

            **(1)**     As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

                  **(a)**     When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant.  Such building is vacant when it does not contain enough business personal property to conduct customary operations.

                  **(b)**     When this policy is issued to the owner of a building, building means the entire building.  Such building is vacant when 70% or more of its total square footage:

                        **(i)**     Is not rented; or

                        **(ii)**     Is not used to conduct customary operations.

            **(2)**     Buildings under construction or renovation are not considered vacant.

      **b.     Vacancy Provisions**

            If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

            **(1)**     We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

                  **(a)**     Vandalism;

    **(b)**    Sprinkler leakage, unless you have protected the system against freezing;

    **(c)**    Building glass breakage;

    **(d)**    Water damage;

    **(e)**    Theft; or

    **(f)**    Attempted theft.

**(2)**    With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

See Id. State Auto relied upon the results of its investigation, including the statements made by Wallace Jaco, a representative of Plaintiff, along with the opinions of State Auto's attorney as the basis for relying upon the Vacancy Provision and denying the Plaintiff's claim. (See Doc. 2 and Exhibit 10).

This litigation was filed by Plaintiff on November 26, 2014. Plaintiff alleged State Auto insured Plaintiff's building; that there were damages to it resulting from theft; and that State Auto wrongly applied the Vacancy Clause of the policy to deny the claim when the property was not vacant under that provision. (Doc. 1). Plaintiff also claimed State Auto's conduct in handling Plaintiff's claim was intentional, fraudulent, malicious, and/or reckless, justifying punitive damages. Id.

Plaintiff has proffered as an expert witness, Chuck Howarth. (Exhibit 12). Mr. Howarth authored a report setting forth his opinions and has been deposed in this matter. (Copy of initial report attached hereto as Exhibit 13 and supplemental report as Exhibit 14). Plaintiff seeks to utilize the testimony of Mr. Howarth to prove State Auto breached the contract of insurance in bad faith (and/or intentionally, fraudulently, maliciously, and/or

recklessly) and to prove damages caused to Plaintiff's property.  The testimony of Chuck Howarth should be excluded as set forth more fully herein.

## LAW AND ARGUMENT

An expert witness may testify in the form of an opinion if he is qualified "by knowledge, skill, experience, training or education…" and his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue…."  Fed. R. Evid. 702.  The opinion, however, is not admissible if it "merely express[es] a legal conclusion[.]" Demerrell v. City of Cheboygan, 2006 WL 3090133 at * 7 (6th Cir. Oct. 31, 2006)(citing Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994)). In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set forth guidelines for courts to use in determining the admissibility of expert testimony under Rules 702 and 104 of the Federal Rules of Evidence.  Typically, the evaluation of expert testimony is generally left to juries, but the trial judge takes on a "gatekeeping" role with respect to expert proof. Id. at 597–98, 113 S.Ct. 2786 (citing FRE 104(a)).

In order to act as an expert witness, Rule 702 requires that the expert testify to "scientific, technical or other specialized knowledge." Fed. R. Evid. 702. The Daubert court explained that this serves to establish a standard of "evidentiary reliability" or "trustworthiness."  Daubert, 509 U.S. at 591. As the Sixth Circuit recently explained:

> [I]n addition to requiring that a proposed expert's testimony be "reliable," Rule 702 requires that the expert's testimony assist the trier of fact. This requirement has been interpreted to mean that scientific testimony must "fit" the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify.  See Daubert, 509 U.S. at 592, 113 S.Ct. 2786. In short, under Daubert and its progeny, a party proffering expert testimony must show by a "preponderance of proof" that

the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case. See id. at 592 n. 10, 113 S.Ct. 2786.

Pride v. BIC Corp., 218 F.3d 566, 576-78 (6th Cir. 2000).

The proposed testimony must assist the trier of fact.  While Daubert focused on scientific testimony, the United States Supreme Court expanded the trial court's gatekeeping role to all expert testimony in Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137 (1999).

**A.    Howarth's Testimony and Opinions Regarding The Vacancy Provision and State Auto's Claims Handling Should Be Excluded**

In his initial report, attached as Exhibit 13, Mr. Howarth opined that State Auto "did not attempt in good faith to effectuate a prompt, fair and equitable settlement of this claim" and that State Auto's handling was "not good faith conduct, was contrary to the normal and customary standards expected of property adjusters, and was reckless at best or intentional/malicious/fraudulent at worst."  Id. at 3. Mr. Howarth then went on to explain why he believes this.  For instance, Mr. Howarth stated that there was a "chronology of recommendations and decisions about setting Reserves and the loss valuation that trends upward, right up to the point of denial." Id.  However, Howarth provided no basis for this in his report.  He did not even explain State Auto's, or any insurance industry standard for that matter, concerning the setting and maintaining of reserves.

Howarth further complained about State Auto's investigation.  The Vacancy Clause required a determination of the amount of space in a building used for "customary operations" in order to determine whether the clause applies.  Howarth

complained about specific steps taken in State Auto's investigation, but more or less admitted he did not know why the claim was denied.   However, other than his complaints about the handling of the investigation in light of the Vacancy Clause, Howarth provides no reasons providing the basis of his opinion that State Auto's decision was "a malicious and intentional effort to defraud the insured of benefits…"  Id. at 4.  He also failed to address the role State Auto's coverage counsel played in State Auto's coverage investigation and whether it was reasonable and appropriate both in the insurance industry and under the facts of this case to rely upon the opinions of counsel.

Howarth provided his supplemental report November 13, 2015 including supplemental "opinions" concerning the handling of the claim.  (Exhibit 14).  These included his "opinions" about State Auto's investigation and the lace of facts used to support its denial based upon the Vacancy provision of the policy.  Id. at 2-3.  His opinions concerning State Auto's conduct were based upon his interpretation of the Vacancy provision and the investigation of facts and/or analysis of facts that should have been used by State Auto concerning the issue of coverage.  Id.  It is based upon these opinions that Howarth opines the claim was not handled in good faith.  Id.

The opinions of Chuck Howarth are based upon his being "employed in the property damage insurance claims business for over thirty five (35) years…" including as an adjuster with State Farm Insurance Company and later as a public adjuster.  Id. at 1.[1]   However, in all of his opinions regarding how the Vacancy Provision should be

---

[1] Howarth testified that he cannot remember the name of the individual he reported to while working for State Farm.  Dep. Howarth, p. 18.  Thus, State Auto has no way to verify Howarth's experience as a State Farm representative.

construed in relation to the loss at issue, Mr. Howarth speaks merely as a layperson (not as an expert) with a view of how the insurance provision should work.

Howarth's deposition was taken November 17, 2015.  In his deposition, he was questioned about his opinions, including the Vacancy Provision, claims handling, and the use of outside counsel.  Howarth testified:

- He does not recall ever being in a case where a Vacancy provision like the one at issue in this case was involved.  Dep. Howarth, p. 24, lines 12-16 (Excerpts attached as Exhibit 15).

- He does not remember being involved in a claim while employed with State Farm as a re-inspector or trainer either that had this kind of Vacancy provision.  Dep. Howarth, p. 24, lines 17-20.

- Though testifying that he has been involved in as many as one hundred (100) cases where a vacancy provision was at issue, he did not recall seeing a vacancy provision of this particular type.  Dep. Howarth, p. 25, lines 1-14.

- Howarth testified that when he had questions on how to address coverage issues, he would rely upon F.C. & S. Bulletins, but does not recall ever reviewing such a bulletin on a Vacancy provision as at issue in this case. Dep. Howarth, p. 53, line 15 – p. 54, line 1.

- He has never given an opinion on any State Auto case concerning this particular Vacancy provision.  Dep. Howarth, p. 84, line 25 – p. 85, line 2.

- Howarth does not have a law degree.  Dep. Howarth, p. 18, lines 15-16.

- Howarth has no special training in linguistics.  Dep. Howarth, p. 18, lines 17-23.

- Outside of school, Howarth has had no education in either English or Grammar.  Dep. Howarth, p. 18, line 24 – p. 19, line 4.

- He does not fault State Auto in any way for seeking a legal opinion on the vacancy provision.  Dep. Howarth, p. 82, lines 16-18.

Based upon his own testimony, Howarth has no specialized training, experience or education that would assist the jury in the interpretation of the Vacancy provision of the policy.  In fact, Howarth would have no greater knowledge, experience or training on

this Vacancy provision than most any juror selected to serve in this case.  He is simply not an expert on the Vacancy provision.  Without such specialized knowledge concerning the Vacancy provision, Howarth's opinions are conclusory at best.  Mr. Howarth's proposed testimony, when boiled down to its most simple statement, is that State Auto should not have relied upon the Vacancy provision and thus, should have paid this claim. That testimony does nothing to assist the jury with respect to the Vacancy provision contained in the State Auto policy.

Because Howarth's opinions concerning the Vacancy provision will not assist the jury, his overall opinions concerning State Auto's claims handling should also be excluded.  Howarth's opinions concerning State Auto's claims handling stem entirely from his analysis of the Vacancy Provision.  Because he is not qualified to render an opinion on the Vacancy Provision, Howarth's testimony concerning State Auto's alleged failures in its investigation related to the applicability to the Vacancy Provision simply cannot assist the jury.  Thus, Howarth's opinions concerning State Auto's claims handling in light of the Vacancy Provision should likewise be excluded.

The only other potential basis for Howarth's opinions concerning State Auto's alleged bad faith handling of this claim concerns the valuation of the loss itself. However, Howarth testified he could not conclude that State Auto's evaluation of the amount of damages being different that his own constituted bad faith or improper claims handling.  Dep. Howarth, p. 80, lines 11-20.

Howarth's anticipated testimony and opinions concerning the Vacancy Provision of the policy and State Auto's claims handling simply will not assist the jury.  Howarth has no more specialized training on the Vacancy Provision than the average juror, and

his opinions on the handling of the claim stem only from the provision itself.  Further, Howarth admits it was acceptable to obtain and follow advice of counsel.  Accordingly, Howarth should be excluded from testifying on these issues at trial.

**B.      Howarth's Testimony and Opinions Concerning The Value of Loss Should Be Excluded**

Howarth's "expert" report indicated Arthur Grandinetti assisted in the loss valuation process.  (Exhibit 13, p. 1).  Grandinetti reportedly has twenty-four (24) years of construction and restoration experience.  Id.  Grandinetti was a general contractor and owned his own construction and restoration company.  Id.  Grandinetti also has experience adjusting claims as an independent adjuster.  Id. at 2.

Howarth testified both he and Grandinetti walked the Plaintiff's building together to assess the damage, but that Grandinetti was the one who actually input information into the Xactimate computer program to create the repair estimate.  (Exhibit 15, Dep. Howarth, p. 36, line 18 – p. 37, line 22).  Howarth testified he reviewed the estimate and participated in decisions about the scope of loss that would be included.  Id.

To allow both Howarth and Grandinetti to testify on the value of loss claimed by Plaintiff would be duplicative and/or cumulative.  The Court is "free to exclude any expert testimony, including testimony of an announced expert, if the testimony is cumulative or redundant under Fed.R.Evid. 403." Bowman v. Corr. Corp. of Am., 350 F.3d 537, 547 (6th Cir. 2003) citing In re Air Crash Disaster, 86 F.3d 498, 527 (6th Cir.1996).  Since Grandinetti is the individual who actually prepared the estimate setting forth the alleged value of loss, only Grandinetti should testify.  Grandinett's testimony

would likely assist the jury (if at all) more than that of Howarth.  Testimony from Howarth on the value of the loss issue should thus be excluded.

### CONCLUSION

Based upon the foregoing, Defendant requests that this Court exclude the opinions and testimony of Chuck Howarth concerning the Vacancy Provision and claims handling as such will not assist the jury, and likewise exclude his opinions and testimony concerning the value of loss as duplicative and cumulative.

Respectfully submitted,


 s/ E. Jason Ferrell     _____
**PARKS T. CHASTAIN**
Registration No. 13744
(615) 256-8787, Ext. 114
DIRECT:  (615) 630-7717
pchastain@bkblaw.com
**E. JASON FERRELL**
Registration No. 24425
(615) 256-8787, Ext. 116
DIRECT:  (615) 630-7716
jferrell@bkblaw.com
Attorneys for Defendant, State Auto Property
And Casualty Insurance Co.

**BREWER, KRAUSE, BROOKS,**
**& CHASTAIN, PLLC**
P. O. Box 23890
Nashville, TN   37202-3890

### CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2015, a true and correct copy of the foregoing Memorandum of Law in Support of Motion to Exclude Plaintiff's Proffered Expert Howarth was filed electronically.  Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U. S. Mail.  Parties may access this file through the

court's electronic filing system.

J. Brandon McWherter, Esquire
Gilbert Russell McWherter Scott Bobbitt, PLC
341 Cool Springs Boulevard, Suite 230
Franklin, TN   37067

William Ryan, Esquire
Donati Law, PLLC
1545 Union Avenue
Memphis, TN 38104

         _s/ E. Jason Ferrell_____
         **E. JASON FERRELL**

EJF:dmt